IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HOWARD GIMBEL AND MARVIN DAVIS )<br>)<br>Petitioners, )<br>v. )<br>)<br>UBS FINANCIAL SERVICES, INC., F/K/A UBS )<br>PAINEWEBBER, INC., AND CHARLES NICKY BANK, )<br>)<br>Respondents. )<br>) | Case No.:<br>FILED STAMP: JULY 30, 2008<br>08CV4319<br>JUDGE ZAGEL<br>MAG. JUDGE NOLAN<br>J. N. |

**NOTICE OF REMOVAL**

Respondents UBS Financial Services, Inc., f/k/a UBS Painewebber, Inc. ("UBS") and Charles Nicky Bank ("Bank") (collectively, "Respondents") by and through their undersigned counsel and pursuant to 28 U.S.C. §§ 1441 and 1446, hereby remove this action from the Circuit Court of Cook County, Illinois, County Department, Law Division, to the United States District Court for the Northern District of Illinois, and in support thereof, state as follows:

1.  On June 26, 2008, Petitioners Howard Gimbel and Marvin Davis (collectively, "Petitioners") filed a Petition to Vacate Arbitration Award and Void Agreement to Arbitrate against Respondents ("Petition") in the Circuit Court of Cook County, Illinois, County Department, Law Division, Case No. 2008 L 007024, a copy of which was received by counsel for Respondents on July 1, 2008. A copy of the Petition is attached hereto as Exhibit A. To the best of Respondents' knowledge and belief, this document constitutes all of the process, pleadings and orders served upon Respondents as of the date of this Notice. *See* 28 U.S.C. § 1446(a).

2.  This matter is a civil action over which the District Court of the United States has

original jurisdiction under 28 U.S.C. § 1331. The Petition asserts claims for fraud and fraud in the inducement against Respondents based on a claim that Respondents violated the federal securities laws by "failing to preserve documents" "in violation of the SEC rules." (Pet. ¶ 44.)

3. A case is deemed to "arise under" federal law for purposes of 28 U.S.C. § 1331 not only when a plaintiff seeks relief under a federal law but also when "a state-law claim necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005). Petitioners' fraud in the inducement claim explicitly relies on an alleged violation of Section 17(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78a *et seq.*, and the rules promulgated thereunder, which require broker-dealers to preserve certain records related to their accounts. *See* 15 U.S.C. § 78q. The Federal Courts have exclusive jurisdiction to resolve issues related to "any liability or duty" created pursuant to the Exchange Act, 15 U.S.C. § 78aa. Resolving Petitioners' claims will require the Court to determine whether a state law claim based on an alleged violation of the Exchange Act is cognizable given the absence of a private right of action under that statute and the exclusive jurisdiction of the Federal Courts to interpret and enforce the Exchange Act; and whether the non-disclosure of an unknown violation of a federal regulation pursuant to the Exchange Act can provide the basis for a claim of fraudulent inducement, notwithstanding the comprehensive federal regulation regarding disclosures by broker-dealers to the public; and/or whether the Respondents knowingly violated the record-keeping requirements of the Exchange Act, and the rules and regulations promulgated thereunder, at the time Claimants signed agreements with Respondent UBS. Thus, Petitioners' claims turn on the construction and application of federal

law, including the interpretation and application of regulations within the exclusive jurisdiction of the Federal Courts, and pose a substantial federal question. Petitioners' claims arise under federal law, and this Court has jurisdiction over Petitioners' claims under 28 U.S.C. § 1331.

4.  Removal is supported by, among other things, recent case law. In *Gobble v. Hellman*, Case No. 02-CV-0076, 2002 WL 34430286 (N.D. Ohio March 26, 2002), the plaintiffs asserted various claims for breach of fiduciary duty and abuse of control predicated on the defendants' alleged failure to comply with SEC rules and regulations in violation of the Exchange Act. *Id.* at *3-4. The defendants removed the action to federal court on the ground that it raised a federal question, and the plaintiffs sought remand. In denying remand, the court held that the Plaintiffs breach of fiduciary duty claims "depend upon whether Defendants violated their duties under the Federal Exchange Act and SEC rules and regulations. Therefore, the resolution of Plaintiff's claims requires a construction and adjudication of substantial questions of federal law, and jurisdiction in this Court is proper." *Id.* at *3. This rationale applies with equal force in the instant litigation.

5.  This Notice of Removal is timely, having been filed within thirty days of July 1, 2008, the earliest date any Respondent received the Petition. *See* 28 U.S.C. § 1446(b).

6.  A copy of this Notice of Removal is being filed with the Circuit Court of Cook County, Illinois, County Department, Law Division, in accordance with 28 U.S.C. § 1446(d).

7.  No admission of fact, law or liability is intended by this Notice of Removal, and Respondents expressly reserve the right to assert all defenses, affirmative defenses and motions otherwise available to them individually or collectively.

8.  All Respondents consent to this Notice of Removal.

WHEREFORE, pursuant to 28 U.S.C. §§ 1441 and 1446, Respondents remove this action from the Circuit Court of Cook County, Illinois, County Department, Law Division to the United States District Court for the Northern District of Illinois, Eastern Division.

Dated: July 30, 2008                                          Respectfully submitted,

UBS FINANCIAL SERVICES INC.
F/K/A UBS PAINEWEBBER, INC., AND
CHARLES NICKY BANK

By:   /s/ Christian T. Kemnitz
      Arthur W. Hahn
      Christian T. Kemnitz
      Laura A. Bernatowicz
      KATTEN MUCHIN ROSENMAN, LLP
      525 West Monroe Street
      Chicago, Illinois 60661-3693
      (312) 902-5200
      (312) 902-1061 (fax)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 30th day of July, 2008, I caused a copy of the foregoing NOTICE OF REMOVAL to be filed and served by the ECF System as to Filing users and by email and first-class United States mail, postage prepaid, on the following counsel of record:

Edward T. Joyce & Associates, P.C.
11 South LaSalle Street
Suite 1600
Chicago, IL 60603
(312) 641-2600
ejoyce@joycelaw.com

William J. Harte Ltd.
111 West Washington Street
Suite 1100
Chicago, IL 60602
(312) 726-5015
wharte@williamharteltd.com

/s/ Christian T. Kemnitz
One of the Attorneys for Respondents

```
08CV4319
JUDGE ZAGEL
MAG. JUDGE NOLAN
J. N.
```

# EXHIBIT A

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| HOWARD GIMBEL, MARVIN DAVIS, | ) |
| | ) |
| Petitioners, | ) |
| | ) |
| v. | ) Case No. 2008L007024 |
| | ) |
| UBS FINANCIAL SERVICES, INC., | ) |
| F/K/A UBS PAINEWEBBER, INC. and | ) |
| CHARLES NICKY BANK, | ) |
| | ) |
| Respondents. | ) |

### PETITION TO VACATE ARBITRATION AWARD
### AND VOID AGREEMENT TO ARBITRATE

Now come Petitioners, Howard Gimbel ("Gimbel") and Marvin Davis ("Davis"), and state as their Petition to Vacate Arbitration Award entered in favor of UBS Financial Services, Inc., f/k/a UBS Painewebber, Inc. ("UBS"), and Charles Nicky Bank ("Bank"), and to relieve Gimbel and Davis of any obligation to arbitrate disputes with UBS and Bank, as follows:

### NATURE OF ACTION

1. This case arises out of UBS's misconduct prior to and during an arbitration conducted before the Chicago Board of Options Exchange ("CBOE") by Petitioners against UBS and Bank (collectively, "Respondents") for breach of their duty of due care in handling Petitioners' accounts. Specifically, Petitioners claimed that UBS negligently handled their accounts by recommending an unsuitable trading strategy and by failing to advise them of the extreme risk of engaging in that unsuitable strategy. The arbitration panel entered an award in favor of Respondents and against Petitioners. As explained herein, the award should be vacated pursuant to Section 10(a) of the Federal

Arbitration Act ("FAA") because UBS procured the award by fraud materially related to issues in the arbitration. 9 U.S.C. §10(a). In addition, UBS fraudulently induced Petitioners to enter into agreements to arbitrate by concealing its violation of SEC rules requiring UBS to preserve documents relating to customer accounts. At the time Petitioners opened their accounts at PaineWebber (now UBS) and agreed to arbitrate disputes relating to their accounts, UBS was in violation of SEC rules requiring the preservation of documents relating to, among other things, ~~to~~ customer accounts and transactions in those accounts, which rules were designed to protect customers like Petitioners. The documents UBS was required to preserve, but did not, were the type of documents that UBS knew it would be required to produce to customers before a customer arbitration was conducted so the customer could prove its claims and/or disprove UBS's defense to the customer's claims.

### THE PARTIES

2.  Howard Gimbel is a resident of Northbrook, Illinois. He is 76 years old and is retired.

3.  Marvin Davis is a resident of Niles, Illinois. He is 76 years old and retired.

4.  UBS Financial Services, Inc., formerly known as UBS PaineWebber, Inc. ("UBS"), is a division of UBS AG, a Swiss financial services company. UBS was formed in November 2000 when UBS AG merged with UBS Inc. UBS has its principal offices in New York, NY.

5.  Defendant Charles Nicky Bank was the immediate supervisor of Howard Jacobson (Jacobson), the UBS broker who served Petitioners' accounts. He was also the

manager of UBS's Northbrook office both when Petitioners opened their accounts and throughout the period of the events described herein.

### JURISDICTION AND VENUE

6. This Court has jurisdiction because: (a) UBS transacts business in Illinois; (b) the acts complained of took place in Illinois; and (c) the individual defendant, Bank, is a citizen of Illinois.

7. Venue is proper in this Court because the conduct at issue took place and had an effect in this County.

### FACTS

#### BACKGROUND

8. Between December 21, 1998 and September 2000, Petitioners executed customer account agreements with UBS which contained arbitration clauses. At the time Petitioners executed those arbitration agreements, they did not know that UBS was violating and had been violating Securities and Exchange Commission ("SEC") rules relating to retention of external and internal e-mails relating to the type of accounts Petitioners were about to open. Some time before Petitioners commenced the arbitration at issue here, Bank as the office manager of UBS's Northbrook office, began to destroy UBS documents and/or to suggest that employees of UBS's Northbrook office that they destroy documents that would have helped UBS customers prevail in their arbitrations against UBS. Petitioners do not know when Bank began to destroy UBS documents and/or "suggest" to other UBS employees that they destroy documents (except that it was before the arbitration at issue).

9. Petitioners asked for production of all documents relating to their accounts in conjunction with their demand for arbitration, and were led to believe by UBS's responses that those documents were produced. As Petitioners found out after the conclusion of their arbitration, UBS failed to either produce or acknowledge the fact that it was not going to produce the following documents:

3

      (a)    Letters and memos UBS sent to the SEC regarding Petitioners' accounts; on information and belief, the UBS/SEC correspondence related to the suitability of trading in Petitioners' accounts; and

      (b)    E-mails from UBS's compliance department relating to the suitability of trading in Petitioners' accounts.

Suitability of trades in Petitioners' accounts was one of the key issues in the CBOE arbitration.

    10.    In that regard, unbeknownst to Petitioners, UBS had been censured by the SEC for willfully violating the record-keeping requirements of Section 17(a)(1) of the Exchange Act and SEC Rule 17a-4 during the period of at least July 1, 1999 through June 30, 2002. According to the SEC, during that period, UBS failed to preserve all electronic mail communications (including inter-office memoranda and communications) received and sent by its employees that related to its business as a broker or dealer. The SEC further found that during that period, UBS lacked adequate systems or procedures to ensure the preservation of electronic mail communications.

    11.    Not knowing of UBS's SEC violations or of UBS's failure to retain electronic mail communications, nor of Bank's misconduct in destroying documents, Petitioners: (a) agreed to arbitrate any claims relating to their accounts at UBS; and (b) on June 5, 2006, filed a Statement of Claim to initiate an arbitration against UBS before the CBOE relating to transactions in their accounts from 1999 to 2000.

    12.    Petitioners alleged in their Statement of Claim that UBS was negligent in handling their accounts because UBS failed to advise them that selling thousands of "short put" options on stocks while borrowing against concentrated, unhedged equity positions in those same stocks was unsuitably risky. These "short put" transactions took place from towards the end of 1999 through March 2000.

    13.    During the arbitration hearing, Petitioners testified that (a) Jacobson, their investment advisor at UBS and Davis's then son-in-law, recommended the "short put

strategy"; (b) Jacobson represented that he had structured the short put sales so the risk was minimal and the premiums earned on the sale of short puts was virtually "free money"; and (c) no one from UBS advised Petitioners of the extreme risks of following Jacobson's advice. Jacobson did not testify at the arbitration hearing. At the hearing, UBS, through Bank, committed perjury by denying (a) through (c) and by testifying about the purported existence of a file containing notes of purported conversations with Petitioners regarding risk and suitability.

### BANK'S TESTIMONY

14. The only evidence of disclosure to Petitioners about the immense risk of the short put strategy Jacobson recommended and implemented (and the effect it had on their accounts) came from Bank, who was Jacobson's supervisor. Bank was also the only witness called by UBS to testify that Jacobson had been trained and understood the risks of trading short puts so that it was appropriate for him to recommend the short put strategy to Petitioners. Bank also testified that he had monitored Jacobson and the trading in Petitioners' accounts. UBS knew at the time Bank testified that all of his testimony was false.

15. Bank was the only witness UBS presented who claimed to have had any substantive contact with Petitioners.

16. Bank claimed that he discussed with Gimbel and Davis the risk of selling short puts. He also claimed his conversations with Gimbel and Davis convinced him that the short put strategy was suitable for them. Gimbel and Davis denied these conversations took place.

17. Bank testified that he took notes of these alleged conversations. When UBS could not produce those purported notes, Bank testified that instead of putting his notes or even copies of his notes in UBS's office files, which would have been the procedure usually followed at UBS's Northbrook office, he kept them in his office in a "Howard Jacobson" file for safe keeping. Bank admitted he did not give copies of those

5

purported notes to the Northbrook office's administrative manager who ordinarily would have been responsible for filing those types of documents in appropriate UBS files.

18.    The first time that Petitioners learned that Bank claimed to have kept notes of his discussions with them was during the arbitration proceeding. Although those notes should have been produced, neither UBS nor Bank stated before the hearing that those documents once existed but were now either lost or destroyed. It was only through cross-examination of Bank during his testimony (during UBS's case) that the purported existence of the file was first learned. During Bank's cross-examination, it was also discovered that certain UBS e-mails relating to the Petitioners' accounts were either lost or destroyed.

19.    Upon hearing this testimony, the arbitrators directed UBS to: (a) make additional inquiries about the missing file and emails, and (b) report to the arbitrators about the results of those inquiries.

20.    UBS thereafter represented to the arbitrators and to Petitioners that UBS: (a) looked for the notes of Bank's purported discussions with Gimbel and Davis; (b) could not find those notes; (c) was upset about losing Bank's notes because they would help prove its defense; and (d) did not destroy or lose any e-mails relating to Petitioners' accounts because it did not even begin to archive internal emails until November 2001. UBS did not disclose that UBS was required by SEC rules to keep these documents and had been required to keep them since before Petitioners opened their accounts with UBS. UBS also failed to disclose that it had been censured by the SEC for failing to do so.

21.    The arbitrators accepted UBS's representations as being both truthful and complete and moved the hearing along. At the time of the hearing, Petitioners had no reason to believe that the facts were not as UBS represented them to be.

### DISCOVERY OF BANK'S PERJURY

22. It was not until after the arbitration award was entered that Petitioners discovered that both Bank and UBS committed perjury with respect to their testimony described at paragraphs 14-21 *supra*.

23. After the hearing, Petitioners also discovered that UBS had been audited by the SEC in or around March 2001 and that as part of its audit, the SEC was investigating the suitability of transactions in Petitioners' accounts. Petitioners believe that UBS lied to the SEC in letters and memos about Petitioners' sophistication and the suitability of the transactions in their accounts. These types of documents, although requested by Petitioners, were not produced prior to or during the arbitration.

24. It was not until after the arbitration award was entered that Petitioners became aware of the SEC audit. They learned of the audit when they received a four-sided document from Jacobson's ex-wife after the arbitration hearing. Mrs. Jacobson had been cleaning out her ex-husband's home office and discovered the document (hereinafter referred to as the "audit document"). She gave it to Davis (her father) who in turn gave it to his counsel.

25. The audit document revealed that UBS had undergone an audit by the SEC during March 2001, and that during the audit the SEC became concerned about the trading in the Petitioners' accounts at UBS's Northbrook office. According to the audit document, in March 2001, UBS asked Jacobson and Bank to provide the SEC with a letter containing information about Gimbel's and Davis's investment knowledge. Saline M. Gerber, UBS's First Vice President, Senior Regulatory Coordinator, told Jacobson to make his letter sound like Petitioners were very sophisticated (which was false), so that the SEC auditor would be convinced their trading was suitable.

26. The audit document also revealed that the SEC auditor discovered that UBS inappropriately extended excessive margin to Petitioners and others, and Bank told Jacobson to keep this fact secret from Petitioners. Moreover, the audit document

7

demonstrated that: (a) UBS should have told their customers of its margin mistake, but instead covered up the fact; (b) UBS should never have allowed Petitioners to build up the excessive short put option positions in their accounts; and (c) there was a lack of supervision of Jacobson by Bank, UBS's margin department and UBS's compliance department. These were key issues in the CBOE arbitration.

27. In addition, the audit document established that Bank told Jacobson to: (a) cover up UBS's error with respect to margin; (b) destroy certain documents which Dean Witter was seeking from Jacobson and UBS; and (c) "keep quiet" about what had gone on in the Petitioners' accounts because Bank would lose his job if Jacobson "came clean".

28. Further, the audit document exposed Bank's "suggestion" to Jacobson that if Jacobson hid/destroyed his documents relating to a lawsuit Dean Witter filed against Jacobson, Bank would take the position that he could not find UBS's copy of the same or similar documents. This "suggestion" by Bank to Jacobson, although relating to the Dean Witter litigation, demonstrates that Jacobson and Bank were willing to destroy documents to defeat a claim.

29. According to the audit document, Bank was concerned that he could lose his license for failing to supervise Jacobson and others if Petitioners sued UBS.

30. It was not until Petitioners saw the audit document that they discovered that Bank had committed perjury during the arbitration hearing. In other words, neither Gimbel nor Davis had the ability to discover UBS's and Bank's fraud until they became aware of the audit document, the SEC audit and the facts surrounding that audit.

31. It is clear from the audit document that UBS's reaction to the SEC audit was clearly and unmistakably one of concern. It is also clear that UBS told Bank to deal with the SEC's Gimbel/Davis inquiries in an untruthful way. In that regard, there is evidence from the audit document that Bank wanted Jacobson to lie to the SEC and keep quiet and/or lie to Petitioners because Bank could lose his job if Jacobson "came clean".

Also, there is evidence that "PaineWebber (now UBS) screwed up regarding margin and told Jacobson and Bank to cover it up." At the very least, the audit document supports a claim that UBS and Bank would suborn perjury and hide or destroy documents to keep from losing a case.

32. During the arbitration hearing, while Bank was testifying about his purported discussions with Petitioners and his "file" which supposedly contained notes regarding those conversations, he never once disclosed the SEC audit or the SEC sanction. It is clear that there never were any notes regarding Bank's alleged conversation with Gimbel and Davis. And, if UBS and Bank were willing to misrepresent the existence of the notes, it is not a far leap to conclude that they misrepresented the existence of the discussions Bank allegedly had with Gimbel and Davis regarding risk.

33. It is telling that the audit document makes not one mention of Bank's purported notes or files regarding Petitioners. If such notes actually existed -- i.e., if Bank had actually made notes about actual conversations with Petitioners regarding suitability and risk -- the audit document would surely have referenced such helpful documents because they would have been shared with the SEC.

34. Moreover, Bank testified that he kept the memos and notes of his purported conversations with Petitioners in a file in his office, and that those notes would have been taken sometime in 1999 and 2000. UBS received a letter during April 2002 from counsel for Petitioners complaining about UBS's negligent handling of their accounts. By that time, UBS was under an obligation because of Rule 17a-4 to preserve those memos and notes for three years, so UBS should have been able to produce documents relating to Petitioners from April 1999 onward, and it should have secured all documents relating to Petitioners until their complaints were resolved. UBS's obligation was heightened by the fact that it was put on notice that Petitioners had a complaint against UBS with respect to their accounts and that they were represented by counsel.

9

In light of its heightened duty, it is clear that if the notes in fact existed, UBS's counsel would have had them and would have been able to produce them. Nevertheless, Bank's file was not produced at that time or at any time thereafter.

35. Despite UBS's assurance to Petitioners' counsel in June 2002 that UBS was aware of its obligations to preserve relevant documents, the notes and e-mail responses that were allegedly kept in Bank's file were not preserved. UBS was put on notice of a possible claim against it in April 2002. Even though Bank did not leave the employ of UBS until 2003, he testified during the arbitration that he did not recall UBS asking him to look for or keep documents relating to Petitioners.

## COUNT I

### FRAUD

36. Plaintiffs reallege and incorporate paragraphs 1 through 35 as paragraph 36 of this Count I.

37. Under Section 10(a) of the FAA, an arbitration award must be vacated if the arbitration award was produced by corruption, fraud or other undue means.

38. Perjury materially related to an issue of consequence in an arbitration proceeding constitutes fraud in the procurement of an arbitration award.

39. Bank committed perjury when he testified about (a) supervising Petitioners' accounts; (b) Jacobson being trained to make the recommendation that Petitioners engage in the short put strategy recommended by Jacobson; and (c) his purported discussions with Gimbel and Davis about risk, and when he testified about his purported notes which allegedly documented those discussions.

40. This perjury could not reasonably have been discovered in the exercise of due diligence before the close of the arbitration hearing.

41. The perjury materially related to an issue in the arbitration.

42.     If Bank, and therefore UBS, had not committed the perjury complained of herein, the arbitrators would never have heard evidence that Bank (a) supervised Petitioners' accounts; (b) Jacobson had been trained to make the recommendation Petitioners engage in the short put strategy recommended by Jacobson; and (c) his purported discussions with Gimbel and Davis about risk, and when he testified about his purported notes which allegedly documented those discussions. Since Bank was the only UBS witness to testify who claimed to have had any substantive discussions with Petitioners, the arbitration award necessarily reflects the influence his testimony had on the arbitration panel.

## COUNT II

### FRAUD IN THE INDUCEMENT

43.     Plaintiffs reallege and incorporate paragraphs 36 through 42 as paragraph 43 of this Count II.

44.     UBS failed to disclose to Petitioners that they engaged in the practice, in violation of the SEC rules and in breach of its duty to Petitioners, of failing to preserve documents relating to their accounts which would likely help Petitioners prove their claims and disprove UBS's defenses in the event of arbitration.

45.     Petitioners justifiably relied on the nondisclosure, i.e., if they had been aware of the concealed facts, they would not have agreed to arbitrate their claims.

46.     As a proximate result of UBS's fraudulent inducement, Petitioners agreed to arbitrate their claims.

47.     Petitioners were damaged in that they were compelled to participate in an arbitration where they were not given a fair opportunity to present their case to the arbitrators. UBS's failure to disclose its practice of not preserving relevant documents which should be available to claimants in an arbitration hearing placed Petitioners at an unfair disadvantage from the beginning. The arbitration agreement is therefore invalid.

WHEREFORE, Petitioners Howard Gimbel and Marvin Davis respectfully request this Court to enter an order granting the following relief:

A. Vacating the April 14, 2008 arbitration award;

B. Rescinding the arbitration agreements;

C. Granting Petitioners a trial before the Circuit Court of Cook County; and

D. For other such further relief as this Court deems justified.

HOWARD GIMBEL AND<br>
MARVIN DAVIS,

By: *Edward T. Joyce*
Their Attorney.

EDWARD T. JOYCE & ASSOCIATES, P.C.
11 South LaSalle Street
Suite 1600
Chicago, IL 60603
(312) 641-2600
Atty. I.D. 32513

WILLIAM J. HARTE LTD.
111 West Washington Street
Suite 1100
Chicago, IL 60602
(312) 726-5015