IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| HOWARD GIMBEL AND MARVIN DAVIS | ) | |
| | ) | |
| Petitioners, | ) | **Case No.: 08-cv-4319** |
| v. | ) | |
| | ) | **Honorable Judge James B. Zagel** |
| UBS FINANCIAL SERVICES, INC., F/K/A UBS | ) | |
| PAINEWEBBER, INC., AND CHARLES NICKY BANK, | ) | **Magistrate Judge Nan R. Nolan** |
| | ) | |
| Respondents. | ) | |
| | ) | |

### MOTION TO DISMISS AND TO CONFIRM ARBITRATION AWARD

Pursuant to Sections 6 and 12 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 6 and 9 U.S.C. § 12, UBS Financial Services, Inc., f/k/a/ UBS PaineWebber, Inc. ("UBS") and Charles Nicky  Bank ("Bank") (collectively, "Respondents") move to dismiss as time-barred the Petition to Vacate Arbitration Award and Void Agreement To Arbitrate ("Petition") filed by Howard Gimbel and Marvin Davis (collectively "Petitioners") in the Circuit Court of Cook County and removed to this Court on July 30, 2008.  Respondents also move to dismiss the Petition for failing to make the requisite showing for relief.  Finally, to the extent that Respondents are forced to respond to the Petition as it stands (for which there is no basis) Respondents request additional time to respond and also move to confirm the award entered in the arbitration at issue here (the "Arbitration Award") pursuant to 9 U.S.C. § 13.

### Introduction

The Petition cannot stand because, under § 6 of the FAA, an application to vacate an arbitration award must be filed as a motion, not as a petition or complaint.  Petitioners' failure to comply with this motion requirement is not a mere technical deficiency.  Rather, the FAA's

motion requirement embodies the fundamental principle that arbitration awards are entitled to extreme deference and that parties challenging an arbitration award – like Petitioners – must bear the burden of bringing a motion demonstrating why the Arbitration Award should be vacated.  In contrast, Petitioners are attempting to shift their burden onto Respondents by challenging the Arbitration Award under the guise of a "Petition," hoping that Respondents will bear the burden of disproving the allegations of the Petition much like the burden of a defendant to a civil complaint.  Petitioners' burden-shifting ploy is impermissible under the FAA and the Federal Rules of Civil Procedure and must be rejected.

Moreover, Petitioners' attempt to seek relief by a Petition rather than by a motion is fatal to their case.  First, by seeking relief through a Petition instead of by a motion, Petitioners have failed to file a motion within the three-month period prescribed by the FAA and are thus time-barred from challenging the Arbitration Award.  Second, by seeking relief through a Petition instead of by a motion, Petitioners misperceive the heavy burden they must satisfy to obtain relief from the Arbitration Award and fall far short of that high standard.  As such, the Petition must be dismissed for failing to make the requisite showing for relief.  Finally, to the extent Respondents would be required to respond to the Petition, either in its current form or in the form of a motion, Respondents request additional time to respond and also move to confirm the Arbitration Award.

**The Arbitration**

Petitioners commenced the Arbitration by filing a statement of claim with the Chicago Board Options Exchange ("CBOE") in September of 2006.  The Arbitration occurred over two weeks in January 2008 and an additional four days of hearings scheduled by the panel in March 2008 due to the complexity of the case and the amount of evidence to be presented.  During their

case in chief, Petitioners presented four witnesses over five days of testimony and entered 22 exhibits into evidence. UBS presented six witnesses and entered into evidence over 200 documents into evidence over five days. In all, UBS produced over 24,000 pages of documents during the Arbitration process. The hearings concluded with a full day of closing arguments by counsel on March 7, 2008. Following the hearing, both sides submitted briefs to the panel. On April 14, 2008, the Panel issued an award denying Petitioners all relief. *See* Arbitration Award, attached hereto as Exhibit 1, at 4.

**I.    Petitioners Cannot Prevail Here Because The FAA And Federal Case Law Require That Any Challenge To An Arbitration Award Be Made By *Motion*, Not By Complaint, Application Or Petition As Petitioners Have Done.**

Federal courts – including the Seventh Circuit – have repeatedly held that a party challenging an arbitration award must do so by filing a motion, not by filing a complaint, application or petition.[1] *Kruse v. Sands Bros. & Co., Ltd.*, 226 F. Supp. 2d 484, 486 (S.D.N.Y. 2002) ("the statutes and rules do not permit a party to initiate a challenge to an arbitration award by filing a complaint or an Application . . . ."); *Health Services Mgmt. Corp. v. Hughes*, 975 F.2d 1253, 1258 (7th Cir. 1992); *O.R. Sec., Inc. v. Prof'l Planning Associates, Inc.*, 857 F.2d 742, 745 (11th Cir. 1988); *Interior Finish Contractors Ass'n of Del. Valley v. Drywall Finishers Local Union No. 1955*, 625 F.Supp. 1233, 1240 (E.D. Pa. 1985).[2]

---

[1]    Petitioners cannot escape this requirement of filing a motion by arguing that they originally filed this case in Illinois state court. First, Petitioners filed their state-court Petition pursuant to the FAA (Petition, ¶ 1), so the FAA's motion requirement controls. Moreover, the Illinois Arbitration Act – like the FAA – requires that any application challenging an arbitration award be in the form of a motion. *See* 710 ILCS 5/15 ("Except as otherwise provided, an application to the court under this Act shall be by motion and shall be heard in the manner and upon the notice provided by law or rule of court for the making and hearing of motions in civil cases.").

[2]    The "statutes and rules" upon which these courts rely in reaching this conclusion are the FAA and the Federal Rules of Civil Procedure. Specifically, Section 6 of the Federal Arbitration Act provides that "[a]ny application to the court hereunder shall be made and heard in the manner provided by law for the making and hearing of motions . . . ." 9 U.S.C. § 6. The Federal Rules of Civil Procedure defer to this provision: "***Other Proceedings***. These rules, to the extent

This distinction between seeking relief by motion and seeking relief by a complaint or petition is critical. As the *Kruse* Court explained, the requirement that such relief be brought by motion "affects the burdens of the various parties as well as the rule of decision to be applied by the district court." *Kruse*, 226 F. Supp. 2d at 487 (citation omitted). If Petitioners were allowed to proceed with their Petition,

> the burden of dismissing the [Petition] would be on [Respondents] – the party not only defending the arbitration award but also seeking its confirmation. The burden would be on [Respondents] to show that [Petitioners] could not prove any facts that would entitle them to relief from the Award. This is contrary to the FAA and basic principles of fairness. This burden placed on the party seeking vacatur is extraordinarily high, given the strong federal policy in favor of enforcing arbitral awards.

*Kruse*, 226 F. Supp. 2d at 487 (internal citations omitted).

Enforcing the FAA's motion requirement – and thus ensuring that the burden is properly placed upon the party seeking to vacate an arbitration award and not the party defending the award – is essential to preserving the federal arbitration scheme and the policy interests underlying arbitration. Specifically, by honoring the presumption in favor of upholding arbitration awards and by placing a high burden on those challenging their validity, courts promote the goals of encouraging arbitration and reducing the expenditure of time and resources. *Kruse*, 226 F. Supp. 2d at 486 ("In order to promote speedier, less costly dispute resolution and encourage arbitration, the FAA and Federal Rules of Civil Procedure do not contemplate full-blown litigation for the purposes of contesting an arbitration award with which a party may

---

applicable, govern proceedings under the following laws, except as these laws provide other procedures: . . . 9 U.S.C. [the Federal Arbitration Act], relating to arbitration . . . ." F.R.C.P. Rule 81(a)(6)(B). Thus, federal courts have repeatedly concluded that "the language of Section 6 preempts the Federal Rules." *Kruse*, 226 F. Supp. 2d at 486; *Hughes*, 975 F.2d 1258. This preemption has far-reaching effects, among these being that all relief from an arbitration award be sought by motion, that the federal rules pertaining to notice pleading do not apply in such cases, nor are parties in such cases entitled to processes under Rule 16, such as a scheduling conference or hearing. *See, e.g., Hughes*, 975 F.2d 1253, 1258; *O.R. Securities*, 857 F.2d at 748.

disagree.")  On the other hand, permitting a party to challenge an arbitration award by filing a complaint or petition reverses the burden that the party would otherwise bear if required to bring a motion; this creates a presumption that the challenge should survive beyond the initial stages and "would almost surely result in protracted litigation."  *Kruse*, 226 F. Supp. 2d at 486 ("If the defending party did not prevail on its motion to dismiss, the proceeding to vacate the arbitration award would develop into full scale litigation, with the attendant discovery, motions, and perhaps trial.")

Accordingly, in *Kruse*, the Court noted that "[t]he document submitted to this Court was not a motion, but rather a complaint disguised as a 'Counter-Petition to Vacate.'"  *Kruse*, 226 F. Supp. 2d at 486.  The *Kruse* Court held that "a *Motion* to Vacate an Arbitration Award is required in order to preserve the proper function of arbitration" and denied the request to vacate brought as a complaint.  *Kruse*, 226 F. Supp. 2d at 487 (emphasis supplied).  Likewise, in *O.R. Securities*, the Court held that "[t]he policy of expedited judicial action expressed in section 6 of the Federal Arbitration Act, 9 U.S.C. § 6, would not be served by permitting parties who have lost in the arbitration process to file a new suit in federal court.  The proper procedure . . . is for the party seeking to vacate an arbitration award to file a Motion to Vacate in the district court." 857 F.2d at 746.  Applying this standard, the court in *O.R. Securities* affirmed the judgment of the district court and denied the request to vacate the arbitration award.  857 F.2d at 749.

Two Seventh Circuit cases have discussed this issue and reaffirm that a challenge to an arbitration award should be brought by the filing of a motion.  *See Hughes*, 975 F.2d at 1258; *Webster v. A.T. Kearney, Inc.*, 507 F.3d 568, 571 (7th Cir. 2007).  However, neither of these cases was decided upon these grounds.  In *Hughes*, for example, neither party questioned whether the petitioner's challenge to the arbitration award should have been made by motion or

otherwise.  The court raised the question itself, noting that "[w]e are puzzled why neither party brought [the issue] to the district court's attention," *Hughes*, 975 F.2d 1258, n.2, but ultimately affirmed the district court's denial of the petition to vacate without reaching that issue. Likewise, in *Webster*, the petitioners brought their challenge to the arbitration award by way of a complaint, to which the court again expressed confusion:

> [W]e are puzzled by the way the parties' attorneys – who purport to be experienced with litigation under the FAA – proceeded in the district court. Under the FAA, "[a] ny application to the court hereunder shall be made and heard in the manner provided by law for the making and hearing of motions.

507 F.3d at 570 (citing 9 U.S.C. § 6).  However, this issue was moot because the only issue before the Court in *Webster* was the timeliness of petitioners' challenge to the arbitration award, which the Court held had been brought one day after expiration of the statutory period.  507 F.3d at 574-75.

## II. Because Petitioners Have Not Filed A *Motion* Under The FAA Within Three Months Of The Arbitration Award, Petitioners Are Time-Barred From Challenging The Award And The Award Should Be Confirmed As A Matter Of Law.

Under the FAA, "[n]otice of a motion to vacate . . . an award must be served upon the adverse party or its attorney within three months after the award is filed or delivered."  9 U.S.C. § 12.  As set forth in the Petition, the Arbitration Award was entered on April 14, 2008.  (Petition at 12.)  Thus, Petitioners were required to file a Motion to Vacate, if they so desired, by July 14, 2002.  Petitioners did not do so.  Instead, Petitioners filed their state-court Petition on June 26, 2008, a copy of which was received by counsel for Respondents on July 1, 2008, and which was removed to this Court on July 30, 2008.[3]

---

[3]     *See* Petition at 1; Notice of Removal at 1. This Court can take judicial notice that no Motion to Vacate was filed in the state-court action prior to the filing of Respondents' Notice of Removal nor has any such Motion to Vacate been filed in this action.  *See Henson v. CSC Credit Services*, 29 F.3d 280, 284 (7th Cir. 1994) (court may take judicial notice of matters of public record outside the pleadings).

The Petition is not a "motion" under the FAA and the filing of the Petition did not toll Petitioners' three-month limitations period. Indeed, the *Kruse* Court addressed this precise issue and held that the respondents had lost the opportunity to challenge the arbitration award by letting the three-month period expire without filing a "Motion to Vacate," even though they had filed a "Cross-Petition to Vacate" within the three-month period.

> Once we determine that Respondents' Cross-Petition to Vacate is not the legal equivalent of a Motion to Vacate, we must consider whether or not Respondents can still file a Motion to Vacate. The Award was issued on June 18, 2002. "Notice of a motion to vacate ... an award must be served upon the adverse party or is attorney within three months after the award is filed or delivered." 9 U.S.C. § 12. Respondents' were required to file a Motion to Vacate, if they so desired, by September 18, 2002. Having failed to do so, they have lost the opportunity to make such a Motion.

*Kruse*, 226 F. Supp. 2d at 487. As in *Kruse*, Petitioners have lost the opportunity to challenge the Arbitration Award. *See also Int'l Union of Oper. Eng'rs, Local No. 841 v. Murphy Co.*, 82 F.3d 185, 188 (7th Cir. 1992) (strictly construing the three-month limitations period under the FAA). Accordingly, the Petition is time-barred.

Moreover, this Court should confirm the Arbitration Award as a matter of law. "When a party moves to dismiss a motion to vacate an arbitration award, the court may, *sua sponte*, treat the motion to dismiss as a motion to confirm the award." *Sanluis Dev., LLC v. CCP Sanluis, LLC*, No. 06 Civ. 11531 (RJH), 2008 WL 2253060, at *2-3 (S.D.N.Y. June 3, 2008). As the *Sanluis* Court explained, "when a court denies a motion to vacate an arbitration award, the court's judgment has the effect of collateral estoppel; the parties cannot relitigate the validity of the award . . . It is therefore sensible for the court to treat a party's opposition to a motion to vacate as a request to confirm the award." *Sanluis*, 2008 WL 2253060 at *3. The *Sanluis* Court further stated that it is particularly appropriate for a Court to treat a motion to dismiss as a

motion to confirm *sua sponte* where, as here – *see infra* at 11 – respondents have expressly requested confirmation of the arbitration award. *Id.*

**III.    In Addition To Dismissing The Petition As Time-Barred, This Court Also Should Dismiss The Petition For Failing To Make The Requisite Showing For Relief And Should Confirm The Arbitration Award As A Matter Of Law.**

Petitioners seek to vacate the Arbitration Award on the basis of fraud, although the Petition does not make the requisite showing for obtaining such extraordinary relief.  The "burden placed on the party seeking vacatur is extraordinarily high, given the strong federal policy in favor of enforcing arbitral awards," *Kruse*, 226 F. Supp. 2d at 487, and "the moving party [has] the burden to set forth sufficient grounds to vacate the arbitration award in his moving papers." *O.R. Securities,* 857 F.2d at 748 ("The rules of notice pleading, Fed.R.Civ.P. 8, do not apply to a proceeding to vacate an arbitration award, as all relief must be sought in the form of a motion.").

In particular, to prevail on their claim to vacate the Arbitration Award on the grounds of fraud, Petitioners: (1) "must establish fraud by clear and convincing evidence"; (2) must demonstrate that  "the fraud must not have been discoverable upon the exercise of due diligence prior to or during the arbitration"; and (3) "must demonstrate that the fraud materially related to an issue in the arbitration." *O.R. Securities,* 857 F.2d at 748.  "[V]ague, remote and speculative charges" cannot support an order vacating an arbitration award. *Scott v. Prudential Sec., Inc*., 141 F.3d 1007, 1015 (11th Cir.1998); *Wash. Mut. Bank, F.A. v. Am. Fin. Network*, 414 F. Supp. 2d 1155, 1157 (S.D.Fla., 2006).

Petitioners provide no such "clear and convincing evidence" in the Petition.  Indeed, they provide no evidence at all to support the extraordinary relief they seek, neither attaching documents or transcripts to the Petition nor even quoting such evidence.  To the contrary, the

Petition is replete with the sort of "vague, remote and speculative charges" proscribed by the courts. First and foremost, virtually all of Petitioners' allegations of fraud rely upon their discovery of a so-called "audit document" that they allegedly received following the Arbitration. (Petition, ¶¶ 22-33.) Tellingly, Petitioners do not attach this document to the Petition. Instead, Petitioners' statements regarding the audit document consist of conclusions as to what the audit document allegedly proves, rather what the document actually says. Respondents (and the Court) are thus unable to ascertain the authenticity – or even the existence – of the document, nor are they able to obtain critical information regarding its content, the truthfulness of Petitioners' characterizations of that content, or context. The absence of such proof cannot be reconciled with the strict showing required to support the vacating of an arbitration award for fraud and, accordingly, the Petition – if considered – must be dismissed.

Likewise, the Petition is devoid of any *facts* supporting Petitioners' conclusory statements that they could not have discovered the alleged fraud through the exercise of due diligence. Quite the opposite. The Petition merely alleges that the audit letter was received after the Arbitration had concluded and then asserts that the audit letter could not have been discovered earlier. (Petition, ¶¶ 24, 40.) However, Petitioners allege that the audit document was in the possession and control of Howard Jacobson ("Jacobson"), Petitioners' investment advisor at UBS and Petitioner Davis's former son-in-law. (Petition, ¶¶ 5, 14.) Incredibly, Petitioners do not allege that they attempted to subpoena documents from Jacobson or call him as a witness – they did not – and therefore their assertion that they could not have discovered the audit document earlier is baseless.

Moreover, as a general matter, the Petition repeatedly makes allegations of fraud that amount to nothing more than accusation and insinuation. The following allegation, for example, is typical:

> It is clear that there never were any notes regarding Bank's alleged conversation with Gimbel and Davis. And, if UBS and Bank were willing to misrepresent the existence of the notes, it is not a far leap to conclude that they misrepresented the existence of the discussions Bank had with Gimbel and Davis regarding risk.

(Petition, ¶ 32.)   How is it "clear that there never were any notes regarding Bank's alleged conversation with Gimbel and Davis"?  Where is the "clear and convincing evidence" for such a claim?  And what is the basis for then making the "leap to conclude" that Respondents made other fraudulent statements?  Rhetoric is not evidence.  Such allegations – bald accusations from which Petitioners make unfounded "leaps" – cannot meet the extraordinarily high burden of establishing fraud sufficient to vacate an arbitration award.

Accordingly, this Court should dismiss the Petition for failing to make the requisite showing for obtaining such extraordinary relief.  Moreover, as discussed *supra* at 7-8, this Court should confirm the Arbitration Award, *sua sponte*, as a matter of law.

**IV.    Should The Petition Be Considered A "Motion" Under The FAA – Even Though There Is No Authority Whatsoever To Do So – Respondents Hereby Move For Leave To Respond To The Petition And, In An Abundance Of Caution, Move *Instanter* For Confirmation Of The Award.**

As discussed herein, this Court has several independent bases for dismissing the Petition and confirming the Arbitration Award, *sua sponte*, as a matter of law.  Accordingly, there is no legal basis for requiring Respondents to respond to the Petition at all, let alone in its current form.  However, should this Court require Respondents to respond to the Petition as currently presented, or should this Court allow Petitioners to file a motion as required by the FAA, Respondents will need, and hereby request, an additional 20 days to respond to the Petition or

-10-

motion and to assert defenses, *inter alia*, that (1) Petitioners have no private right of action – as stated in Respondents' Notice of Removal, (2) Petitioners have waived their claims, and (3) Petitioners have not met their burden of proof to support their claims, including that they have not adequately pled fraud.

Moreover, should this Court not confirm the Arbitration Award *sua sponte* as a matter of law, Respondents hereby move this Court, in an abundance of caution and to avoid any possible argument that Respondents have waived any procedural rights, to confirm the Arbitration Award pursuant to 9 U.S.C. § 9. In support of this motion, Respondents submit the following: (1) the Arbitration Award; (2) account agreements between UBS and Petitioners containing agreements to arbitrate, attached hereto collectively as Exhibit 2; and (3) a proposed order confirming the Arbitration Award, attached hereto as Exhibit 3. *See* 9 U.S.C. § 13 (West 2008) ("The party moving for an order confirming, modifying, or correcting an award shall, at the time such order is filed with the clerk for the entry of judgment thereon, also file the following papers with the clerk: (a) The agreement; the selection or appointment, if any, of an additional arbitrator or umpire; and each written extension of the time, if any, within which to make the award. (b) The award. (c) Each notice, affidavit, or other paper used upon an application to confirm, modify, or correct the award, and a copy of each order of the court upon such an application."); *Herrenkrecht Corp. v. Best Road Boring*, No. 06 Civ. 5106, 2007 WL 1149122 at * 2 (S.D.N.Y Apr. 16, 2007) ("A motion to confirm or vacate an award is generally accompanied by a record, such as an agreement to arbitrate and the arbitration decision itself . . . ."); *Hughes*, 975 F.2d at 1257-59 (affirming district court's denial of motion to vacate based on review of the agreement to arbitrate, a copy of the arbitration award, and several pages of transcript submitted with the parties' motions.)

WHEREFORE, pursuant to 9 U.S.C. § 6 and 9 U.S.C. § 12, Respondents move to dismiss the Petition as time-barred.  Respondents also move to dismiss the Petition for failing to make the requisite showing for relief.  In the alternative, Respondents request that this Court strike the Petition pursuant to § 6 of the FAA and order Petitioners to file their challenge by motion, as required by the FAA.  Finally, to the extent that Respondents are forced to respond to the Petition as it stands (for which there is no basis) or a motion as required by the FAA, Respondents request an additional 20 days to respond and also move to confirm the Arbitration Award pursuant to 9 U.S.C. § 13.


Dated: August 6, 2008                              Respectfully submitted,

                                                   UBS FINANCIAL SERVICES INC.
                                                   F/K/A UBS PAINEWEBBER, INC., AND
                                                   CHARLES NICKY BANK


                                       By:     s/Christian T. Kemnitz_____
                                               Arthur W. Hahn (Bar No. 1099027)
                                                     arthur.hahn@kattenlaw.com
                                               Christian T. Kemnitz (Bar No. 6237427)
                                                     christian.kemnitz@kattenlaw.com
                                               David J. Stagman (Bar No. 6217440)
                                                     david.stagman@kattenlaw.com
                                               Laura A. Bernatowicz (Bar No. 6289055)
                                                     laura.bernatowicz@kattenlaw.com
                                               KATTEN MUCHIN ROSENMAN, LLP
                                               525 West Monroe Street
                                               Chicago, Illinois 60661-3693
                                               (312) 902-5200
                                               (312) 902-1061 (fax)

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 6th day of August, 2008, I caused a copy of the foregoing MOTION TO DISMISS AND TO CONFIRM ARBITRATION AWARD was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  Parties may access this filing through the Court's system.

___s/Christian T. Kemnitz_____

One of the Attorneys for Respondents

# IN ARBITRATION
## UNDER CHAPTER XVIII OF THE RULES
### OF THE CHICAGO BOARD OPTIONS EXCHANGE, INCORPORATED

|  |  |  |
|---|---|---|
| IN THE MATTER OF | ) | |
| | ) | |
| Howard Gimbel and Marvin Davis, | ) | |
| | ) | |
| Claimants, | ) | |
| | ) | |
| v. | ) | File No. 06NM001 |
| | ) | |
| UBS Financial Services, Inc. | ) | |
| F/k/a/ UBS PaineWebber, Inc. | ) | |
| And Charles Nicky Bank, | ) | |
| | ) | |
| Respondents. | ) | |

## Representation

| For Claimants: | Arthur Hahn, Christian Kemnitz (Katten Muchin Rosenman, LLP) |
|---|---|
| For Respondents: | Edward Joyce (Edward T. Joyce and Associates, PC) |

## Pleadings

| | |
|---|---|
| Howard Gimbel and Marvin Davis Statement of Claim and Submission Agreement, filed on or about: | June 22, 2006 |
| UBS Financial Services, Inc. and Charles Bank Answer and Submission Agreement, filed on or about: | August 31, 2006 |
| UBS Financial Services, Inc. and Charles Bank amended Answer and Submission Agreement, filed on or about: | September 1, 2006 |

## Hearing

The named parties appeared at the hearing sessions specified below, and had full opportunity to present arguments and evidence.

| Date(s) | No. of Sessions | Location |
|---|---|---|
| January 7, 2008 | 1 | Chicago, Illinois |
| January 8, 2008 | 2 | Chicago, Illinois |
| January 9, 2008 | 2 | Chicago, Illinois |
| January 10, 2008 | 2 | Chicago, Illinois |
| January 22, 2008 | 2 | Chicago, Illinois |
| January 23, 2008 | 2 | Chicago, Illinois |

Arbitration File No. 06NM001
Award
Page 2 of 5

| January 24, 2008 | 2 | Chicago, Illinois |
| March 4, 2008 | 2 | Chicago, Illinois |
| March 5, 2008 | 2 | Chicago, Illinois |
| March 6, 2008 | 2 | Chicago, Illinois |
| March 7, 2008 | 1 | Chicago, Illinois |

### Summary of Issues

On or about June 22, 2006, Howard Gimbel ("Gimbel") and Marvin Davis ("Davis") (collectively referred to as "Claimants"), filed a Statement of Claim ("Statement of Claim") against UBS Financial Services, Inc. f/k/a UBS PaineWebber, Inc. ("UBS") and Charles Nicky Bank ("Bank") (collectively referred to as "Respondents").

Claimants' Statement of Claim alleged unsuitable investment recommendations and misrepresentations. Specifically, Claimants' allegations included the following: (i) UBS failed to realize that Claimants' portfolios did not fit the risk profiles reflected in Claimants' account opening statements and failed to make certain recommendations, (ii) UBS through its agent Howard Jacobson ("Jacobson") provided inappropriate and unsuitable recommendations and advice to Claimants, (iii) UBS made suggestions to Jacobson that he encourage Claimants to trade options without regard to Claimants' experience and suitability, (iv) UBS failed to give Jacobson any training or instruction about options trading and risk, (v) UBS made recommendations of certain options trades despite that Claimants were retired and contrary to their investment objectives and risk tolerance, (vi) UBS failed to ensure that its recommendations were appropriate and (vii) UBS failed to give appropriate and suitable advice.

Claimants' Statement of Claim also alleged that UBS had a computer program flaw and tried to cover it up. Specifically, Claimants contend that UBS' computer system miscalculated certain equity margin requirements and due to the computer program error, excess credit was extended to Claimants and UBS, and upon UBS' discovery of the problem, failed to inform Claimants.

In its Statement of Claim, Claimants further alleged that Respondents breached its duty of due care (negligence) in UBS' management of the Claimants' accounts and are liable for their negligence. Claimants contend Respondents breached their duty of due care by failing to (i) supervise the handling of claimants' accounts, (ii) review the level of risk in which they were involved, (iii) train Jacobson in options trading, (iv) point out the risks inherent in Claimants' concentrations, (v) advise Claimants to hedge their equity concentrations and (vi) further breached their duty of care by recommending that Claimants engage in options trading while placing purchases on margin in the stock market without warning them about the risk involved. Claimants Statement of Claim also alleged Respondents failed to supervise Jacobson's handling of Claimants' accounts and failed to provide the necessary training to Jacobson for handling risky options trading.

Additionally, Claimants' Statement of Claim also alleged that Respondents breached the NASD rules and regulations and its own internal policies and procedures by failing to supervise Jacobson and failed to provide the necessary training to Jacobson for handling risky options trading.

Claimants' Statement of Claim alleged the following: (i) unsuitability (options trading) – the sale of naked puts by Claimants were unsuitable and the risk incurred from these sales was beyond Claimants' risk tolerance, (ii) Unhedged concentration of "tech" stocks – when Claimants transferred their concentrated stock positions to UBS, UBS should have made certain recommendations and failed to

Arbitration File No. 06NM001
Award
Page 3 of 5

continuously monitor Claimants' concentrated positions, (iii) Respondents violated Section 2310 of the NASD conduct rules contending that it is inconceivable to believe that Respondents believed that writing naked puts on margin was a suitable investment for retired individuals, (iv) Respondents violated Section 3010 of the NASD conduct rules contending that Jacobson received no training in trading options or writing puts, no one at UBS supervised Jacobson's management of Claimants' accounts, and no one at UBS reviewed Claimants' accounts for purposes of protecting UBS' interests, (v) the conduct of UBS and Jacobson in recommending unsuitable options, failing to supervise Jacobson and failing to warn Claimants of the risks associated with their concentrated equity investments constitute breaches of Illinois securities laws.

Claimants contend that such acts by Respondents caused Claimants to suffer damages and that such damages fall into two categories: (1) sale of naked puts and (2) concentration damages. Claimants contend that the total damages suffered by Gimbel were in the range of $40,114,426 to $50,612,555 and the total damages suffered by Davis were in the range of $20,760,959 to $25,726,462.

Therefore, Claimants in their Statement of Claim request that they be awarded: (i) actual damages in the amount of between $60,825,387 and $70,339,017 (ii) attorneys fees and costs (iii) interest (iv) punitive damages and (v) and further relief deemed just by the panel.

Respondent filed an answer to the Statement of Claim on or about August 31, 2006. Respondents filed an amended answer to the Statement of Claim on or about September 1, 2006 ("Answer"). In the Answer, Respondents contend that the Claimants are two exceptionally wealthy businessmen who sold their ownership interests in a large telecommunications company to WorldCom and then brought their already-established positions in WorldCom stock with them to UBS. In their Answer, Respondents contend that Claimants chose to remain concentrated in WorldCom stock despite advice from UBS and that they diversify or hedge their positions and that Claimants chose to invest heavily in a number of other high tech companies and to sell naked puts on WorldCom stock.

Respondents also contend that during the period their accounts were at UBS, the Claimants' investments were profitable overall. In their Answer, Respondents contend that Claimants are not asking the arbitration panel to award Claimants the amounts they truly lost, but rather to put them in the position they would have been in if they liquidated their positions at the peak of the market. Respondents further contend that Claimants' principal arguments are contradicted by the facts, including the following: claimants were neither naïve nor unsophisticated, the risk profile of the six accounts in which the trading that is subject of this claim took place was "Aggressive/Speculative", Respondents did recommend that Claimants diversify their portfolio or otherwise limit their risk, Claimants understood the risks of the option-writing they undertook, Claimants received monthly statements, and in some cases daily reports, reflecting their losses in WorldCom and the tech market decline, Claimants accounts were properly monitored, the error in UBS' computer flaw which affected margin calculations caused Claimants no harm, and Claimants reviewed and signed a variety of documents, including a one-page special statement addressing the risks of writing uncovered put options, in which they specifically stated that they acknowledged and accepted the substantial risks associated with their option strategies.

In the Answer, Respondents contend that Claimants' damages theory is flawed. Respondents contend that Claimants theory assumes the Claimants get the benefit of their concentrated positions during the period in which stock prices were increasing and should have been advised to diversify or hedge only at the peak of the market. Additionally, Respondents contend that Claimants accounts were profitable over the full period they were at UBS. Second, Respondents contend that Claimants' theory assessed against UBS purported losses that Claimants suffered during the period their accounts were at Morgan Stanley,

Arbitration File No. 06NM001
Award
Page 4 of 5

not UBS. Lastly, Respondents contend that UBS did in fact advise Claimants to reduce the risks associated with their concentrated positions but Claimants rejected that advice.

In their Answer, Respondents assert the following additional defenses: Claimants are barred from recovery to the extent required by the terms of any settlement of litigation in which claims relating to WorldCom or other holdings were released and/or enjoined, no right of action lies for violations of the rules of self-regulated organizations, including the NASD, the statement of claim fails to state a claim upon which relief may be granted, the Claimants have not suffered any damages, the Claimants have failed to mitigate any damages they may have suffered, any damages the Claimants may have suffered were not caused by Respondents' actions, the Claimants' claims for damages are limited, in whole or part, by applicable law, the Claimants have no legal or factual basis for recovering punitive damages from the Respondents, Claimants' claims are subject, in whole or part, to the defense of estoppel, Claimants' claims are subject, in whole or part, to the defense of unclean hands, any damages that the Claimants may recover must be reduced by any amount recovered from any other source in compensation for damages allegedly suffered as a result of the allegation in the Statement of Claim, Claimants' claims are barred by the governing statute of limitations, any award to Claimants must be reduced by the doctrines of contributory and/or comparative negligence, Claimants ratified the investments in question by continuing to hold them after their risks became apparent, and Claimants are not entitled to rescission because they have not tendered the securities as to which rescission is sought.

Respondents therefore pray for relief as follows: (i) Claimants' claim be dismissed with prejudice, (ii) that the Claimants have and recover nothing from Respondents, (iii) that the cost of this action be taxed to the Claimants, (iv) that the Claimants be ordered to pay Respondents' attorneys fees, and (v) such other relief as the arbitration panel deems just and proper.

At the start of the hearing on January 7, 2008, due to the Federal Court in New York granting an injunction proceeding which prohibited Claimants from seeking damages regarding WorldCom or derivatives on WorldCom, Claimants voluntarily declared that they would not seek damages related to WorldCom in this arbitration proceeding.

## Award*

After due deliberation and in consideration of the hearing testimony, documentary evidence, and other submissions made by the parties, the undersigned arbitrators, in full and final resolution of all issues in controversy, award as follows:

1. Claimants' request for actual damages is denied.

2. Claimants' request for attorneys' fees and costs is denied.

3. Claimants' request for punitive damages is denied.

4. Respondent's request for attorneys fees and costs is denied.

5. Claimant and Respondent shall pay all filing and forum fees as detailed below.

---

* Pursuant to CBOE Rule 18.31, all monetary awards shall be paid within thirty (30) days of receipt unless a motion to vacate has been filed with a court of competent jurisdiction.

Arbitration File No. 06NM001
Award
Page 5 of 5

## Forum Fees

Pursuant to Exchange Rule 18.33, the Arbitrators assess the following filing and forum fees:

| | | |
|---|---|---|
| Initial Filing Fee – Claim | | $300 |
| Pre-hearing session Fees (1) | | $1,500 |
| Adjournment of hearings (2) | | waived |
| Hearing session Fees (20 x $1,500) | | $30,000 |
| | Total | $31,800 |

1. Responsibility for the filing fee, totaling $300, shall be assessed as follows: Claimants shall be responsible for $300.

2. Responsibility for the forum fees, totaling $31,500, shall be assessed as follows: Claimants shall be responsible for $15,750 and Respondents shall be responsible for $15,750.

3. The Exchange shall retain the non-refundable filing fees and the hearing session deposits, as previously submitted by Claimants. Claimants initially submitted $300 for the filing fee and $1,500 for the hearing deposit.

4. Claimants shall submit $14,250 to the Chicago Board Options Exchange, Incorporated.

5. Respondents shall submit $15,750 to the Chicago Board Options Exchange, Incorporated.


Stephen C. Esposito, Chairman and Public Arbitrator          4/10/08
                                                             Date

Mary Beth Wheeler, Public Arbitrator                         4 –11–08
                                                             Date

Mark R. Fluger, Industry Arbitrator                          4/08/08
                                                             Date

**PaineWebber** [ML]

FULL ACCOUNT TITLE

Marvin Davis Trustee PBO Marvin Davis Trust

CLIENT'S AGREEMENT

BRANCH    ACCOUNT NUMBER    BROKER

**Introduction**

**Applicable Rules and Regulations**

**Amendment or Waiver**

**Transactions and Settlements**

**Marking Sell Orders Long or Short**

**Binding Order**

**Lien Provisions**

**Payment on Instructions Upon Demand**

**Interest Provision**

**I HAVE READ AND UNDERSTAND THE STATEMENT OF CREDIT PRACTICES DESCRIBING INTEREST CHARGES PRINTED ON THE REVERSE SIDE.**

**Sub-Agents**

**Margin Requirements**

**Liquidations and Covering Positions**

**Binding Nature of Agreement**

**Effect of Law or Rule Change**

**Address**

**Client Representation**

**Jurisdiction**

**Credit Review**

**ARBITRATION**

- ARBITRATION IS FINAL AND BINDING ON THE PARTIES.
- THE PARTIES ARE WAIVING THEIR RIGHT TO SEEK REMEDIES IN COURT, INCLUDING THE RIGHT TO JURY TRIAL.
- PRE-ARBITRATION DISCOVERY IS GENERALLY MORE LIMITED THAN AND DIFFERENT FROM COURT PROCEEDINGS.
- THE ARBITRATORS' AWARD IS NOT REQUIRED TO INCLUDE FACTUAL FINDINGS OR LEGAL REASONING AND ANY PARTY'S RIGHT TO APPEAL OR TO SEEK MODIFICATION OF RULINGS BY THE ARBITRATORS IS STRICTLY LIMITED.
- THE PANEL OF ARBITRATORS WILL TYPICALLY INCLUDE A MINORITY OF ARBITRATORS WHO WERE OR ARE AFFILIATED WITH THE SECURITIES INDUSTRY.

**Assignment**

**Accuracy of Reports**

**Joint and Several Accounts**

**Liability for Costs of Collection**

**Loan Consent**

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PAGE 1 AT PARAGRAPH 19.

CLIENT: BE SURE TO RETAIN YOUR COPY

BMKT 1 (Rev. 6/93)    LINCOLN HARBOR NEW ACCOUNTS DEPT.

UBS-GD-0013007
CONFIDENTIAL TREATMENT
REQUESTED BY UBS

RESOURCE
MANAGEMENT
ACCOUNT

[RT]

MICROFILM I.D. NUMBER

BMKT 2472 (Rev. 6/94)

**PaineWebber**

Established 1879
Member of all principal security,
commodity and option exchanges

## Resource Management Account Agreement

| FULL ACCOUNT TITLE | BRANCH | ACCOUNT NUMBER | BROKER |
|---|---|---|---|
| | NI | 39783 | YS |

**Introduction**

This Agreement contains the terms governing PaineWebber's Resource Management Account ("RMA"). In the Agreement, "I", "me" or "my" means each person who signs below. "You," "Your" or "PW" means PaineWebber Incorporated, its successor firms, subsidiaries, correspondents or affiliates. RMA and money market funds (collectively the "Funds") are more fully described in the current RMA disclosure document, Facts About Your RMA and the respective of the RMA Funds (hereafter, collectively called "Disclosure Document(s)").

**Authorization**

I hereby request PW to open in my name a RMA. I understand that if I currently have a PW account, it will be converted into a RMA. I authorize PW to deem automatically any shares of PW CASHFUND, Inc. ("CASHFUND") I hold in my account and to invest the proceeds as provided in paragraph 2 below.

I understand that my request to open a RMA is subject to approval by PW. If approved, PW will open in my RMA after receipt by PW of an executed RMA agreement, a completed section for Checks and Gold MasterCard and, if applicable, the Securities Credit Line (margin) portion of this agreement. By signing this agreement, I acknowledge that I have received and read the Disclosure Document(s).

You may satisfy amounts that I owe in connection with my RMA (such as debit balances in the Securities Account, amounts owing in my Card/Checking account, or investments or deposits made for me that are later reversed), from assets in my Money Accounts (including funds obtained by redeeming Money Fund shares) or from my Securities Accounts (including, if applicable, by making loans to me).

Special Accounts - for use by corporations, partnerships, sole proprietorships, foundations/charitable organizations, custodian accounts, conservatorships, receiverships, estates and trusts: Each of the undersigned represents and warrants that they have the authority to open this RMA on behalf of the named entity, to place in it and to use the assets of the named entity according to their direction.

**Money Accounts**

I agree and authorize you to invest all credit balances in my RMA (such as deposits, dividends or the proceeds from securities transactions) in the money market funds which I have chosen on the Application ("Designated Money Account"). If I do not select a Designated Money Account, I authorize you to invest all credit balances into the RMA Money Market Portfolio.

Additionally, I authorize you to make redemptions of Fund shares in accordance with the terms of the Disclosure Document(s). I agree that you have the right to withhold any redemption proceeds on other payments from my RMA until all funds placed on account in my RMA have been collected. The collection periods are set forth in the Disclosure Document(s).

**MasterCard(s)**

I understand that a RMA Gold MasterCard ("Card") is an optional feature of my account, and that I may apply to Bank One, Columbus, N.A. (Bank One), the Card issuer, to receive it. If approved for a Card I authorize you and Bank One to effect Card transactions in the manner described in the applicable Disclosure Document(s).

I understand that the Card will allow Card transactions to the "Authorization Limit" defined in the Disclosure Document(s). I agree to have sufficient available assets to make payment in full for Card transactions as they become available. I understand that if I have insufficient available assets to cover Card transactions, Bank One may suspend and then cancel my Card. I agree that the use of any Card in connection with my RMA will also be governed by the terms and conditions contained in the Cardholder Agreement that I will receive after my Card application is accepted by Bank One.

By accepting a Card, I agree that I will not dispose of my assets in my RMA or any other account I may have with PaineWebber, if such disposal will negatively affect my obligation to pay PaineWebber for the right to assets in any of my accounts or to use any other assets of mine to pay debts incurred on my Card.

Anything that I have stated in this application is correct, to the best of my

knowledge. I understand that you will retain this application whether or not I receive a Card. I authorize you to obtain any references necessary, to make oral or written inquiries about my credit history, and to answer questions about your credit experience with me. You may contact sources to update this information at anytime, and exchange any information with my PaineWebber Investment Executive or other parties necessary to facilitate RMA card or check transactions. I also agree to be bound by the Cardholder Agreement in effect from time to time upon my approval and acceptance of the Card.

The Ohio laws against discrimination require that all creditors make credit equally available to all creditworthy customers and that each credit reporting agencies maintain separate credit histories on each individual upon request. The Ohio Civil Rights Commission administers compliance with this law.

**Optional Line Of Credit**

I understand that I may apply to Bank One for an optional Line of Credit which will allow me to exceed my RMA "Authorization Limit" for Card transactions as defined in the Disclosure Document(s). I agree to have sufficient MasterCard Availability (my Authorization Limit plus the unused portion of my Line of Credit) to make payment for Card transactions as they become payable. I understand that Bank One will charge me and I agree to pay Bank One for Bank Card activity (as defined in the Cardholder Agreement) and any applicable finance charges on the Line of Credit and that if I do not pay, Bank One may cancel my Line of Credit. I agree that the use of the Line of Credit in connection with my RMA will also be governed by the terms and conditions contained in the Cardholder Agreement for a RMA Card with the Line of Credit that I will receive after my Application is accepted by Bank One.

**RMA Check Writing Privilege**

I understand that I may write checks on a PW RMA Account maintained at Bank One, and that I may use these checks only in conjunction with my RMA and only amounts within my Authorization Limit. I authorize you to reimburse Bank One in Federal Funds when checks are presented to Bank One and to automatically debit my RMA on the day you receive notification for payment from Bank One. I agree to have sufficient assets in my RMA on the day of payment of a check as well as on the day I write the check. I understand that the checks may be used in the same manner and are subject to the normal procedures, rules and regulations as regular checks payable at Bank One. I hereby authorize Bank One in writing and (b) bearing only one signature unless I otherwise instruct Bank One in writing and (b) bearing a signature with an approved first name, a middle initial or a name deleted or added if Bank One otherwise reasonably believes the signature to be authorized.

**Liability**

I agree that I will be personally liable for, and I hereby indemnify PW, the Funds, and Bank One against any losses in connection with my RMA and RMA transactions (including securities transactions, purchases and redemptions of Fund shares, use of the check writing privilege, the Card and the Line of Credit), effected by any person signing my RMA Application or any person to whom I give written authority to use my RMA.

I also agree that no Cards or checks issued in connection with my RMA can be used directly to purchase securities or any other products or services available through you or your correspondents.

I shall at all times be liable for the payment of any amounts advanced, any debit balance or other obligations owing in any of my account(s) with you and I shall be liable to you for any deficiency remaining in any such account(s) in the event of the liquidation thereof, in whole or in part, by you or by me. I shall make payment of any such debit balance, obligation, deficiency, indebtedness, including interest and commissions, upon demand and any costs of collection, including attorney's fees, if incurred by you.

**Payments**

I authorize you to pay automatically, from the Authorization Limit in my RMA, for all transactions incurred by me. All payments will be made in the order of priority described in the Disclosure Document(s). Debts include the amounts I owe to you for securities purchases, RMA account fees, fees for Federal Fund wires, customary transactional and brokerage fees as well as interest I may owe you as a result of margin calls and/or loans. Debts also include any Card transactions or check charges. I agree that Bank One will bill me for Bank Advances and applicable finance charges on my Line of Credit.

My RMA will be processed to request a Securities Credit Line (margin) (as per paragraphs 9 through 200 when you sign below).

☐ Check here if you do NOT want your account established with a Securities Credit Line (margin).

* SIGNING BELOW I CONSENT AND AGREE TO ALL OF THE TERMS AND CONDITIONS OF THE AGREEMENT APPEARING ON THE NEXT PAGE AND ITS REVERSE SIDE AND ACKNOWLEDGE THAT:

* If my account is established with a Securities Credit Line (margin), and I use the Securities Credit Line (margin), that the securities in my margin account may be loaned to you or loaned out to others and;

* If I selected check writing and/or MasterCard, I agree to the terms and conditions of paragraphs 3 and 5.

* I have received a copy of the attached agreement.

The RMA Agreement contains a pre-dispute arbitration clause at page 3 paragraph 28.

| x Marvin Davis | | TSS | 1-3-96 |
|---|---|---|---|
| Signature of first authorized person | Print Name | Title | Date |

| x | | | |
|---|---|---|---|
| Signature of second authorized person | Print Name | Title | Date |

Please check where appropriate:
The following additional ☐ Check User ☐ Card User (who is not a minor)
appointed my agent, unaffected by my subsequent disability or incompetence, to effect transactions in my RMA resulting from such Check Writing/Card use.

x _____
Agent's Signature        Date

UBS-GD-0013022
CONFIDENTIAL TREATMENT
REQUESTED BY UBS

**Securities Account Lien**

8. All securities, including but not limited to monies, stocks, options, bonds, notes, futures contracts, commodities, certificates of deposit and other obligations, contracts or securities ("Property") held or purchased shall be subject to a lien in your favor for the discharge of all my indebtedness and any other obligations that I may owe to you, however and whenever arising, and may be held by you as security for the payment of any such obligations or indebtedness to you in any account you maintain for me including any accounts in which I may have an interest. I'll open or maintain another account which is a margin account, you are authorized without notice to me whenever any Property I have with you are in part (a) transfer interchangeably between any accounts I have with you any or all of the Property so held, without regard to whether you have in your possession or subject to your control other Property of the same kind and amount; (b) in the usual course of business or pledge, repledge, hypothecate, rehypothecate (either for the amount I owe you or for a greater or lesser sum) and lend the Property to you as broker or to others from time to time, separately or commingled with Property carried for other clients and you need not to deliver the same the same Property but only Property of like kind and amount.

**PARAGRAPHS 3 THROUGH 20 APPLY ONLY IF I REQUEST THAT MY RESOURCE MANAGEMENT ACCOUNT BE ESTABLISHED WITH A SECURITIES CREDIT LINE (MARGIN).**

**Applicable Rules and Regulations**

9. All transactions for me shall be subject to the constitution, rules, regulations, bylaws, interpretations, customs and usages of the exchange or market and its clearing house, if any, where the transactions are executed. Such transactions are also subject, where applicable, to the provisions, rules and regulations of the Securities and Exchange Commission, the Commodity Futures Trading Commission, and the Board of Governors of the Federal Reserve System in existence at this time and as later amended and supplemented.

**Transactions**

10. All orders for the purchase and sale of any property will be given by me and executed with the distinct understanding that an actual purchase or sale is intended and that it is my intention and obligation in every case to deliver property to cover any and all sales and in the case of purchases to receive and pay for property that I will on an open and demand. In case you make a short sale of any property at my direction or in case I fail to deliver to you any property which you have sold at my direction, you are authorized to borrow the property necessary to enable you to make delivery to the purchaser and I agree to be responsible for the cost or loss you may incur, or the cost of obtaining the property if you are unable to borrow it. No settlement of any account(s) may occur without your first receiving all property for which the account is short and all property in which the account(s) are long being paid for in full and the property then delivered. You and your correspondents are my constituted agents to complete all such transactions and are authorized to make advances and expend monies as are required.

**Marking Sell Orders Long or Short**

11. When placing with you any sell order for a short account, I will designate it as such and hereby authorize you to mark the order as being "short." When placing with you any order for a long account, I will designate it as such and hereby authorize you to mark the order as being "long." Any sell order which I shall designate as being for a long account, is the property which is owned by me and, if you are unable to deliver this property from any account(s), the placing of the order will constitute my representation that the property will be delivered as required and that I will reimburse you for any expense incurred.

**Interest Provision**

12. All amounts advanced and other balances due shall be charged interest in accordance with your usual custom, which may include the compounding of interest, including any increases in rates which reflect adjustments in the Base Loan Rate, and such other charges as you may make to cover your facilities and extra services. Payment of all amounts advanced and other balances due, together with the interest thereon, shall be made by me to you at any of your offices which will act as my agent for the transmittal of such amounts and other balances due to you at New York, New York.

**I HAVE READ AND UNDERSTAND THE STATEMENT OF CREDIT PRACTICES DESCRIBING INTEREST CHARGES PRINTED IN FACTS ABOUT YOUR RMA.**

**Sub-Agents**

13. You may employ sub-brokers and shall be responsible only for reasonable care in their selection. You may deal with market makers or members of any exchange known as specialists or known as odd lot dealers and in the execution of my orders they may act as sub-brokers for me and may also buy or sell the property for themselves as dealers for their own account.

**Margin Requirements**

14. I agree to maintain in account(s) with you such positions and margin as required for all applicable statutes, rules, regulations, procedures, and customs, or as you deem necessary or advisable, and where applicable, to satisfy any and all margin calls issued in connection with such business.

**Liquidations and Covering Positions**

15. You shall have the right in accordance with your general policies regarding your margin maintenance requirements in existence at the time or, if in your discretion you consider it necessary for your protection to require additional collateral or the liquidation of any account(s) of mine, or, in the event of a petition in bankruptcy, or for appointment of a receiver is filed by or against me, or, an attachment is levied against the account(s) of mine, or, in the event of my death; to sell any or all property in the account(s) of mine with you, whether carried individually or jointly with others, to buy any or all property which may be short in such account(s), to cancel any open orders and to close any or all outstanding contracts, all without demand for margin or additional margin, other notice of sale or purchase, or other notice of advertisement. Any such sales or purchases may be made at your discretion on any exchange or other market where such business is usually transacted, or at public auction or private sale, and you may be the purchaser for your own account. It is understood a prior demand, or call, or prior notice of the time and place of such sale or purchase shall not be considered a waiver of my right to sell or buy without demand or notice as herein provided.

**Effect of Law or Rule Change**

16. In the event any one or more of the provisions contained in this agreement shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such finding or holding shall only affect the provision(s) involved and the remainder of this agreement and the application of all other provisions shall not be affected.

**Address**

17. My address on page one is and will continue to be a correct address until your Lincoln Harbor Office receives written notice of any change. Notices and communications sent to me at such address will constitute personal delivery to me, whether actually received or not.

**Client Representation**

18. I represent to have reached the age of majority according to the laws of the state of my residence. I agree to abide by the rules of the regulatory agencies and your firm's policy if I am employed by any exchange or any corporation of which any exchange owns a majority of the capital stock; member or firm registered on any exchange, bank, trust company, insurance company, or any company or individual dealing, either as broker or principal, in stocks, bonds, or any other securities, commodities, or commercial paper. If during this agreement I become such an employee, you will be notified. No one other than me has or will have an interest in any account(s) of mine unless you are notified in writing by me.

**Credit Review**

19. An investigation of my personal and business credit may be made and, I may make written request, within a reasonable time, for disclosure of the nature of the investigation.

**Accuracy of Reports**

20. ALL REPORTS OF EXECUTION OF ORDERS AND ACCOUNT STATEMENTS SHALL BE CONCLUSIVE IF NOT OBJECTED TO IN BY BE IN WRITING IMMEDIATELY BY NOTICE, SENT TO YOU BY REGISTERED MAIL.

**Fees**

21. I will pay you an annual RMA service fee and any other fees described in the Disclosure Document(s). I understand that the annual fee for the Account is $95 without a Line of Credit and $125 with a Line of Credit. This annual service fee for the Personal Trust Account is $95. This annual service fee and other fees are subject to change by PW at any time. I will also pay any normal brokerage fees for all securities transactions.

I also will pay Bank One and PaineWebber for its customary fees for check charges, specially imprinted checks, stop payment orders, copies of checks, more than one month old and check's returned for insufficient funds. I authorize PW to charge the annual service fee to my RMA upon the opening of my account, and annually thereafter, and to charge my RMA for all other fees owed by me.

I expressly agree that you shall not be bound by any oral representation or agreement made by any of your employees or agents which purports to affect or diminish your rights under this agreement, except as provided in paragraph 23 below.

Any notice which I give shall be binding upon me, and (if/any) personal representative and you receive notice of my death. Such death and notice will not affect your right to take any action which you could have taken if I had not died.

**Assignment**

22. This agreement may be assigned by you and will inure to the benefit of your successors and assigns and you may transfer or assign the account(s) of mine to them, which shall be binding on me and my personal representatives.

**Changes to Agreement**

23. I agree that, upon prior written notice to me, you may change the terms of this agreement at any time. By continuing to make transactions in my RMA, I agree to this acceptance of these changes. If I do not agree to the changes, I will notify you in writing of my refusal and my RMA will be cancelled. However, I will remain liable for any outstanding debit and/or charges in my RMA.

**Jurisdiction**

24. This agreement and its enforcement shall be governed by the laws of the State of New York and shall be binding upon my heirs, executors, administrators, successors and assigns. The terms of the Cardholder Agreement shall be governed by federal laws and the laws of the State of Ohio.

**Termination of RMA**

25. I understand that you or I may terminate my RMA at any time and for any reason. If my RMA is terminated either by you or me, I will promptly return all unused checks and Card(s). Failure to return such Card(s) and checks to you may result in a delay in complying with my instructions as to the disposition of my assets in my RMA. I will remain responsible for debits, charges and the use of the Line of Credit whether arising before or after such termination. I agree to pay you and Bank One promptly for all amounts outstanding in my RMA. Upon termination, I authorize you to redeem at my Fund shares. I further agree that you may withhold from the assets then in my RMA any amounts that you reasonably believe necessary to pay for any outstanding debts to you or Bank One, and to apply such assets first to pay yourself, and second to pay Bank One.

**Joint/Individual Liability**

26. If more than one person signs this agreement, each of us shall be jointly and individually liable. You and/or Bank One may accept any orders and instructions from any of the signers, and, upon receipt of provisional instructions or a court order, may suspend or terminate my RMA or take any other actions required.

**Liability for Costs of Collection**

27. I agree to pay you the reasonable costs and expenses of collection, including attorney's fees, for any unpaid balances in my RMA.

**Arbitration**

28. • ARBITRATION IS FINAL AND BINDING ON THE PARTIES.

- **THE PARTIES ARE WAIVING THEIR RIGHT TO SEEK REMEDIES IN COURT, INCLUDING THE RIGHT TO JURY TRIAL.**

- **PRE-ARBITRATION DISCOVERY IS GENERALLY MORE LIMITED THAN AND DIFFERENT FROM COURT PROCEEDINGS.**

- **THE ARBITRATOR'S AWARD IS NOT REQUIRED TO INCLUDE FACTUAL FINDINGS OR LEGAL REASONING AND ANY PARTY'S RIGHT TO APPEAL OR TO SEEK MODIFICATION OF RULINGS BY THE ARBITRATORS IS STRICTLY LIMITED.**

- **THE PANEL OF ARBITRATORS WILL TYPICALLY INCLUDE A MINORITY OF ARBITRATORS WHO WERE OR ARE AFFILIATED WITH THE SECURITIES INDUSTRY.**

I AGREE, AND IN CARRYING AN ACCOUNT FOR ME YOU AGREE, THAT ANY AND ALL CONTROVERSIES WHICH MAY ARISE BETWEEN YOU AND ME CONCERNING ANY ACCOUNT, TRANSACTION, DISPUTE OR THE CONSTRUCTION, PERFORMANCE OR BREACH OF THIS OR ANY OTHER AGREEMENT, WHETHER ENTERED INTO PRIOR, ON OR SUBSEQUENT TO THE DATE HEREOF, SHALL BE DETERMINED BY ARBITRATION. ANY ARBITRATION UNDER THIS AGREEMENT SHALL BE HELD UNDER AND PURSUANT TO AND BE GOVERNED BY THE FEDERAL ARBITRATION ACT, AND SHALL BE CONDUCTED BEFORE AN ARBITRATION PANEL CONVENED BY THE NEW YORK EXCHANGE, INC., OR THE NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC. I MAY ALSO SELECT ANY OTHER NATIONAL SECURITY EXCHANGE'S ARBITRATION FORUM UPON WHICH PAINEWEBBER IS LEGALLY REQUIRED TO ARBITRATE THE CONTROVERSY WITH ME, INCLUDING, WHERE APPLICABLE, THE MUNICIPAL SECURITIES RULEMAKING BOARD. SUCH ARBITRATION SHALL BE GOVERNED BY THE RULES OF THE ORGANIZATION CONVENING THE PANEL. I MAY ELECT IN THE FIRST INSTANCE THE ARBITRATION FORUM, BUT IF I FAIL TO MAKE SUCH ELECTION, BY REGISTERED LETTER OR TELEGRAM ADDRESSED TO YOU AT YOUR MAIN OFFICE BEFORE THE EXPIRATION OF FIVE DAYS (5) AFTER RECEIPT OF A WRITTEN REQUEST FROM YOU TO MAKE SUCH ELECTION THEN YOU MAY MAKE SUCH ELECTION. THE AWARD OF THE ARBITRATORS, OR OF THE MAJORITY OF THEM, SHALL BE FINAL, AND JUDGMENT ON THE AWARD RENDERED MAY BE ENTERED IN ANY COURT OF COMPETENT JURISDICTION.

NO PERSON SHALL BRING A PUTATIVE OR CERTIFIED CLASS ACTION TO ARBITRATION, NOR SEEK TO ENFORCE ANY PRE-DISPUTE ARBITRATION AGREEMENT AGAINST ANY PERSON WHO HAS INITIATED IN COURT A PUTATIVE CLASS ACTION; WHO IS A MEMBER OF A PUTATIVE CLASS WHO HAS NOT OPTED OUT OF THE CLASS WITH RESPECT TO ANY CLAIMS ENCOMPASSED BY THE PUTATIVE CLASS ACTION UNTIL; (I) THE CLASS CERTIFICATION IS DENIED; (II) THE CLASS IS DECERTIFIED; OR (III) THE CUSTOMER IS EXCLUDED FROM THE CLASS BY THE COURT. SUCH FORBEARANCE TO ENFORCE AN AGREEMENT TO ARBITRATE SHALL NOT CONSTITUTE A WAIVER OF ANY RIGHTS UNDER THIS AGREEMENT EXCEPT TO THE EXTENT STATED HEREIN.

I EXPRESSLY AGREE THAT SERVICE OF PROCESS IN ANY ACTION SHALL BE SUFFICIENT IF SERVED BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, AT MY LAST ADDRESS KNOWN TO YOU. I EXPRESSLY WAIVE ANY OBJECTION TO SERVICE OF PROCESS AS SET FORTH ABOVE.

UBS-GD-0013023
CONFIDENTIAL TREATMENT
REQUESTED BY UBS

**CLIENT QUALIFICATION FORM OPTIONS**

**PaineWebber**

MICROFILM I.D. NUMBER

☒ NEW OPTION ACCOUNT
☐ UPDATING EXISTING OPTION ACCOUNT

Today's Date

**FORM MUST BE COMPLETED PRIOR TO BOM APPROVAL**

Branch | Account Number

**GENERAL BUSINESS CLIENT INFORMATION**

Name, Address/Please add ★ before each last name

City | State | Zip Code  IL

Country (If Other Than U.S.)

**POWER OF ATTORNEY**

**ACCOUNT HOLDER'S FINANCIAL AND INVESTMENT INFORMATION**

Return Objective | Risk Profile

DATE DISCLOSURE BOOKLET FURNISHED TO CLIENT

**DATE**

INVESTMENT EXECUTIVE (PRINT) | INVESTMENT EXECUTIVE'S SIGNATURE | BRANCH MANAGER'S SIGNATURE

**COMPLIANCE USE ONLY (If applicable)**

REGISTERED OPTION PRINCIPAL APPROVAL (SIGNATURE) | DATE

**CLIENT - PLEASE SIGN REVERSE SIDE AND RETURN TO BRANCH**
BRANCH COPY

UBS-GD-0012965
CONFIDENTIAL TREATMENT
REQUESTED BY UBS

MICROFILM I.D. NUMBER

# PaineWebber [OA]

## CLIENT OPTION AGREEMENT AND QUALIFICATION FORM

| FULL ACCOUNT TITLE | BRANCH | ACCOUNT NUMBER | BROKER |
|---|---|---|---|
| GF TRADING | N I | 4 5 2 5 8 | I S |

**Introduction**

1. This agreement contains the respective rights and obligations arising from the handling, purchasing, selling and/or endorsing of puts and/or calls, or variations thereof. In this agreement "I", "me" or "my" means each person who signs below. "Your" or "PaineWebber" means PaineWebber Incorporated, its successor firms, subsidiaries, correspondents, affiliates or employees.

**Personal Representations**

2. I acknowledge receipt of the current Option Risk Document(s) and all applicable amendments, am aware of the special risks attendant to option trading, and am financially able to sustain any losses resulting from such risks. A copy of the current OCC prospectus and all applicable supplements are available to me upon request.

3. PaineWebber Incorporated (PWI) has the right to make such reviews of my financial status as it may deem necessary.

**Transactions**

4. All transactions for me shall be subject to the constitution, rules, regulations, by-laws, interpretations, customs and usages of the National Association of Securities Dealers, exchange or market and its clearing house, if any, where the transactions are executed. I further agree that I(they/it) will not either alone or in concert with others, violate the position or exercise limits, which The National Association of Securities Dealers, exchanges or markets and their clearing houses may set from time to time.

5. On certain trading days, trading may cease or be restricted in one or more classes of options and this may result in financial disadvantage or loss to me. I agree to hold PWI, its Officers, Directors, and agents, harmless for this or any other loss resulting from any acts made in accordance with the constitution, rules, interpretations and policies, customs, or regulations of the exchange(s) involved or the Options Clearing Corporation.

6. Any orders to buy or sell the options mentioned in the preceding paragraph given by me or through anyone else may be refused by you at your sole discretion, and I shall not hold you liable for any loss that it may sustain due to your refusal to permit the purchase or sale of said options during such period.

**Exercises And Expirations**

7. You shall not be liable in connection with the execution, handling, purchasing and/or endorsing of puts and/or calls, for the account(s) of me, except for gross negligence or wilful misconduct on your part.

8. I understand and agree to abide by your requirements and time limitations for accepting an exercise notice from me.

9. For purchases for my account(s), notice will be given of the intent of me to exercise such Option no later than 4:00 P.M. New York Time the business day before the expiration of such Option. Failure to give such notice will constitute abandonment by me of such an Option in which event it may be permitted to expire or, in your sole discretion, sold or acquired by you for your own account without any liability or responsibility on your part to me. In those situations where abandoned options are exercised profitably the net proceeds after deducting the costs of processing the transaction will be shared with me.

10. In the event less than three days remain until expiration, and when the firm has, after repeated attempts, been unable to contact me regarding any option positions about to expire, which remain in my account(s), the firm then may exercise the limited discretion granted here to liquidate those positions as it may deem appropriate. This limited discretionary authority shall not require the firm to take any action whatsoever. In the event the firm should liquidate any option positions, my account(s) will be credited in a fair and equitable manner.

**Credit Provisions**

11. Before writing any put or call my account must have a minimum equity or appropriate position in such amounts as you may specify from time to time. No withdrawals of cash or securities will be permitted from the account(s) which would reduce either the equity or position below your requirements.

12. I will maintain in my account(s) with you such positions and margin as required by regulatory rules or as you deem necessary or advisable, and where applicable, to respond to any and all margin calls issued by you in connection with such business. If I fail to respond to your margin calls promptly and fully, you are authorized in your discretion and without notification to me to take such steps as you may deem appropriate to protect your position and any obligation which may have been assumed at the request of me.

13. If I fail to make payment of any monies due you under this agreement, you may sell any other securities held in my account(s) whether individually or jointly with another and apply the proceeds of such sale on account of this indebtedness to you under the terms of this agreement.

14. Any and all expenses incurred by you in connection with the foregoing may be charged to the account(s) of, and will be fully reimbursed by me.

**General**

15. The provisions of this Agreement shall apply to all puts and/or calls, or variations thereof, which you may have executed, purchased and/or handled for my account(s) and also to puts and/or calls, or variations thereof, which you may hereafter purchase, handle, and/or execute for its account(s).

16. In case of any insolvency, bankruptcy, death or attachment of my property, you may, with respect to any pending options, take such steps as you consider necessary to protect yourself against loss.

17. In case of assignment of option contracts, it is understood that PWI will employ the random method of allocation. This procedure will randomly select from all customers short option positions, including positions established on the day of assignment, those contracts which are subject to exercise. It is understood by me that all short option positions are liable for assignment at any time. A detailed description of this method is available upon written request.

**Relationship to Client Agreement**

18. This Agreement supplements where applicable the Client's Agreement entered into between us and will not diminish any of your rights under said Agreement. In the event of any conflict between the terms of this Agreement and the terms of the Client's Agreement, the provisions of this Agreement shall prevail.

**ARBITRATION**

19. • ARBITRATION IS FINAL AND BINDING ON THE PARTIES.
   • THE PARTIES ARE WAIVING THEIR RIGHT TO SEEK REMEDIES IN COURT, INCLUDING THE RIGHT TO JURY TRIAL.
   • PRE-ARBITRATION DISCOVERY IS GENERALLY MORE LIMITED THAN AND DIFFERENT FROM COURT PROCEEDINGS.
   • THE ARBITRATOR'S AWARD IS NOT REQUIRED TO INCLUDE FACTUAL FINDINGS OR LEGAL REASONING AND ANY PARTY'S RIGHT TO APPEAL OR TO SEEK MODIFICATION OF RULINGS BY THE ARBITRATORS IS STRICTLY LIMITED.
   • THE PANEL OF ARBITRATORS WILL TYPICALLY INCLUDE A MINORITY OF ARBITRATORS WHO WERE OR ARE AFFILIATED WITH THE SECURITIES INDUSTRY.

I AGREE, AND BY CARRYING AN ACCOUNT FOR ME YOU AGREE, THAT ANY AND ALL CONTROVERSIES WHICH MAY ARISE BETWEEN YOU AND ME CONCERNING ANY ACCOUNT, TRANSACTION, DISPUTE OR THE CONSTRUCTION, PERFORMANCE, OR BREACH OF THIS OR ANY OTHER AGREEMENT, WHETHER ENTERED INTO PRIOR, ON OR SUBSEQUENT TO THE DATE HEREOF, SHALL BE DETERMINED BY ARBITRATION. ANY ARBITRATION UNDER THIS AGREEMENT SHALL BE HELD UNDER AND PURSUANT TO AND SHALL BE GOVERNED BY THE FEDERAL ARBITRATION ACT, AND SHALL BE CONDUCTED BEFORE AN ARBITRATION PANEL CONVENED BY THE NEW YORK EXCHANGE, INC., OR THE NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC. I MAY ALSO SELECT ANY OTHER NATIONAL SECURITIES EXCHANGE'S ARBITRATION FORUM UPON WHICH PAINEWEBBER IS LEGALLY REQUIRED TO ARBITRATE THE CONTROVERSY WITH ME, INCLUDING, WHERE APPLICABLE, THE MUNICIPAL SECURITIES RULE MAKING BOARD. SUCH ARBITRATION SHALL BE GOVERNED BY THE RULES OF THE ORGANIZATION CONVENING THE PANEL. I MAY ELECT IN THE FIRST INSTANCE THE ARBITRATION FORUM, BUT IF I FAIL TO MAKE SUCH ELECTION, BY REGISTERED LETTER OR TELEGRAM ADDRESSED TO YOU AT YOUR MAIN OFFICE, BEFORE THE EXPIRATION OF FIVE DAYS (5) AFTER RECEIPT OF A WRITTEN REQUEST FROM YOU TO MAKE SUCH ELECTION THEN YOU MAY MAKE SUCH ELECTION. THE AWARD OF THE ARBITRATORS, OR OF THE MAJORITY OF THEM, SHALL BE FINAL, AND JUDGMENT UPON THE AWARD RENDERED MAY BE ENTERED IN ANY COURT OF COMPETENT JURISDICTION.

NO PERSON SHALL BRING A PUTATIVE OR CERTIFIED CLASS ACTION TO ARBITRATION, NOR SEEK TO ENFORCE ANY PRE-DISPUTE ARBITRATION AGREEMENT AGAINST ANY PERSON WHO HAS INITIATED IN COURT A PUTATIVE CLASS ACTION; WHO IS A MEMBER OF A PUTATIVE CLASS WHO HAS NOT OPTED OUT OF THE CLASS WITH RESPECT TO ANY CLAIMS ENCOMPASSED BY THE PUTATIVE CLASS ACTION UNTIL; (I) THE CLASS CERTIFICATION IS DENIED; (II) THE CLASS IS DECERTIFIED; OR (III) THE CUSTOMER IS EXCLUDED FROM THE CLASS BY THE COURT. SUCH FORBEARANCE TO ENFORCE AN AGREEMENT TO ARBITRATE SHALL NOT CONSTITUTE A WAIVER OF ANY RIGHTS UNDER THIS AGREEMENT EXCEPT TO THE EXTENT STATED HEREIN.

I EXPRESSLY AGREE THAT SERVICE OF PROGRESS IN ANY ACTION SHALL BE SUFFICIENT IF SERVED BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, AT MY LAST ADDRESS KNOWN TO YOU. I EXPRESSLY WAIVE ANY DEFENSE TO SERVICE OF PROCESS AS SET FORTH ABOVE.

**Assignment**

20. This Agreement may be assigned by you and will inure to the benefit of your successors or assigns and shall be binding on me and my personal representatives.

**Effect of Law or Rule Change**

21. In the event any one or more of the provisions contained in this agreement shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such finding or holding shall only affect the provision(s) involved and the remainder of this agreement and the application of all other provisions shall not be affected.

**VERIFICATION**

I HAVE PERSONALLY SUPPLIED ALL OF THE INFORMATION REQUESTED ON THE QUALIFICATION FORM ON THE REVERSE SIDE OF THIS DOCUMENT. I DECLARE IT IS ACCURATE AND AGREE TO ADVISE YOU IN WRITING OF ANY MATERIAL CHANGES IN MY FINANCIAL SITUATION AND/OR INVESTMENT OBJECTIVES. BY SIGNING THIS AGREEMENT THE CUSTOMER ACKNOWLEDGES RECEIPT OF THIS AGREEMENT. THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT COLUMN 2 AT PARAGRAPH 19.

| | | |
|---|---|---|
| _(signature)_ | | |
| CLIENT'S SIGNATURE (TITLE WHEN APPLICABLE) | DATE | CLIENT'S SIGNATURE (TITLE WHEN APPLICABLE)     DATE |

(CLIENT: BE SURE TO RETAIN YOUR COPY)

UBS-GD-0012963
CONFIDENTIAL TREATMENT
REQUESTED BY UBS

Case ... Document ... Filed ... Page 8 of 9

# ACCOUNT APPLICATION

Detach and Return to PaineWebber
newaccount.com

Please indicate the ownership of this account:

## PRIMARY ACCOUNT HOLDER/TRUST/ESTATE

HOWARD GIMBEL
SYBIL GIMBEL

13535 PRESTILEE DR
NORTHBROOK IL 60089

Retired

## JOINT ACCOUNT HOLDER/SPOUSE/CUSTODIAN/TRUSTEE/EXECUTOR

SYBIL GIMBEL

13535 PRESTILEE LN
NORTHBROOK IL 60089

Homemaker

## RESOURCE MANAGEMENT ACCOUNT (RMA) FEATURES

Please select the features and services for your RMA. Deferred for the first year, the annual fee for an RMA is $95.

- [ ] Daily "Sweep" of Uninvested Cash Balances (Select one)
- [ ] Check Writing

## MARGIN

## PAINEWEBBER CASHFUND

## ADDITIONAL SERVICES

## ACCOUNT HOLDER'S FINANCIAL INFORMATION AND INVESTMENT OBJECTIVES

### Financial Information

Net Worth (exclusive of residence)

### Account Investment Objective

## AGREEMENT

X Howard Gimbel

X Sybil Gimbel

GD000052



UBS-GD-0012933
CONFIDENTIAL TREATMENT
REQUESTED BY UBS

PaineWebber ML    CLIENT'S AGREEMENT

FULL ACCOUNT TITLE

Howard Gimbel & Marvin Davis

BRANCH    ACCOUNT NUMBER    BROKER

NH 9605  TIS

*Handwritten signature* Howard Gimbel    8/18/97

CLIENT! BE
SURE TO RETAIN
YOUR COPY

BMKT 1 (Rev 8/93)    LINCOLN HARBOR NEW ACCOUNTS DEPT.

UBS-GD-0012915
CONFIDENTIAL TREATMENT
REQUESTED BY UBS

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| HOWARD GIMBEL AND MARVIN DAVIS | ) | |
| | ) | |
| Petitioners, | ) | Case No.: 08-cv-04319 |
| v. | ) | Honorable Judge James B. Zagel |
| | ) | Magistrate Judge Nan R. Nolan |
| UBS FINANCIAL SERVICES, INC., F/K/A UBS | ) | |
| PAINEWEBBER, INC., AND CHARLES NICKY BANK, | ) | |
| | ) | |
| Respondents. | ) | |

## ORDER CONFIRMING ARBITRATION AWARD

This cause having been heard upon Respondents' Motion To Dismiss And To Confirm Arbitration Award the Court being fully advised in the premises, IT IS HEREBY ORDERED:

1.    Respondents Motion To Dismiss And To Confirm Arbitration Award is granted;

2.    Petitioners Howard Gimbel and Marvin Davis' Motion to Vacate Arbitration Award and Void Agreement To Arbitrate is denied;

3.    The arbitration award rendered by the Chicago Board Options Exchange ("CBOE") on April 14, 2008 (CBOE Case No. 06 NM 00001) denying relief to Petitioners Howard Gimbel and Marvin Davis on their demand for compensatory and punitive damages, attorneys fees and costs and attached to Respondents Motion To Dismiss And To Confirm Arbitration Award as Exhibit 1 is hereby confirmed pursuant to 9 U.S.C. § 9;

4.    Judgment is entered in conformity with the CBOE arbitration award attached to Respondents' Motion To Dismiss And To Confirm Arbitration Award as Exhibit 1.

Entered:_____, 2008                    _____

**Prepared By:**
Arthur W. Hahn (Bar No. 1099027)
arthur.hahn@kattenlaw.com
Christian T. Kemnitz (Bar No. 6237427)
christian.kemnitz@kattenlaw.com
David J. Stagman (Bar No. 6217440)
david.stagman@kattenlaw.com
Laura A. Bernatowicz (Bar No. 6289055)
laura.bernatowicz@kattenlaw.com
**KATTEN MUCHIN ROSENMAN, LLP**
525 West Monroe Street
Chicago, Illinois 60661-3693
(312) 902-5200
(312) 902-1061 (fax)